IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | |
|---|---|
| CINDY DAVISON, individually and as ADMINISTRATOR OF THE ESTATE OF RANDALL DAVISON, <br><br> Plaintiff, <br><br> vs. <br><br> GEORGIA CORRECTIONAL HEALTH, LLC d/b/a Georgia Correctional HealthCare and STEVE NICOLOU, P.A., <br><br> Defendants. | CIVIL ACTION NO. <br><br> JURY TRIAL DEMANDED <br><br> CV 616-039 |

## COMPLAINT

Plaintiff Cindy Davison, in her individual capacity and as Administrator of the Estate of Randall Davison, deceased ("Plaintiff"), by counsel, states as follows for her Complaint:

### I. PRELIMINARY STATEMENT

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 arising from the death of Randall Davison.

2. Mr. Davison died on February 15, 2015, because Defendants – with disregard and deliberate indifference to Mr. Davison's serious and life threatening

medical need – refused to provide Mr. Davison necessary medical care while he was in the custody of the Georgia Department of Corrections ("the Department") at Georgia State Prison (GSP) in Reidsville, Georgia.

3. Before Mr. Davison's death, he repeatedly sought medical care for a serious infection stemming from a tattoo on his forearm.

4. Despite the beet-red appearance of Mr. Davison's arm, neck, and chest; the discolored tattoo recently applied to his arm; the tenderness of his chest; his complaints of difficulty breathing and walking; and his numerous pleas for medical care; Defendants refused to treat Mr. Davison on multiple occasions between January 16, 2015, and January 26, 2015.

5. When Mr. Davison became critically ill on a Friday due to the infected tattoo, the Defendants left him to further deteriorate without any medical care for three full days, because the Defendants did not have a medical provider readily available over the weekend. No efforts were made to send Mr. Davison to a hospital emergency department or to any outside provider, even though he was clearly succumbing to a rapidly worsening infection. When Mr. Davison finally received treatment on the following Monday, his infection had progressed to severe sepsis from which he did not recover.

6. Mr. Davison died of sepsis and related multi-system organ failure because Defendants deliberately refused him urgent and necessary medical care at

the time when the need for emergency care was obvious and his infection was still treatable.

7. Mr. Davison died on February 15, 2015. He was due to be released from prison the following month.

8. Defendants' actions and omissions proximately caused Mr. Davison's death in violation of the Eighth Amendment to the United States Constitution.

9. Plaintiff seeks damages for the death of her brother due to the deliberate indifference of the Defendants.

## II. JURISDICTION

10. This action is brought pursuant to 42 U.S.C. § 1983, and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

## III. VENUE

11. Venue is proper in this District and in the Statesboro Division because the actions and omissions causing Mr. Davison's death occurred at GSP, which is in Tattnall County, Georgia. Tattnall County is in the Southern District of Georgia, Statesboro Division.

## IV. PLAINTIFF

12. Plaintiff Cindy Davison is the sister of Randall Davison and the administrator of her deceased brother's estate. Mr. Davison was in the custody of the Georgia Department of Corrections when he developed an infection which – due to Defendants' deliberate disregard to his need for immediate medical care –

3

caused his death. At the time of his death, Mr. Davison was serving a two-year prison sentence for a technical probation violation, stemming from underlying 2011 convictions for drug and weapon possession. Ms. Davison brings this action in her individual capacity and in her capacity as administrator of the estate of Randall Davison.

## V. DEFENDANTS

13. Georgia Correctional Health, LLC d/b/a Georgia Correctional HealthCare (GCHC) is a Georgia Limited Liability Company.

14. The Department contracts with GCHC to provide medical care to the people incarcerated at GSP.

15. At all times relevant to this Complaint, GCHC was acting under color of state law as a contractor for the Department.

16. Steve Nicolou is employed by GCHC as a physician assistant for GSP.

17. Defendant Nicolou is responsible for the medical care of GSP inmates.

18. Upon information and belief, Defendant Nicolou was aware of Mr. Davison's serious need for medical care, but with deliberate indifference refused to treat Mr. Davison.

19. At all times relevant to this Complaint, Defendant Nicolou was acting under color of state law.

20. Plaintiff anticipates that she will discover additional Defendants during the course of discovery in this action.

## VI. STATEMENT OF FACTS

### A. Mr. Davison's tattoo and infection

21. In late December 2014 or early January 2015, another prisoner tattooed Mr. Davison's forearm.

22. People in prison commonly tattoo each other in unsterile conditions with improvised needles and ink.

23. There are high risks of infection when prisoners tattoo each other under these conditions.

24. Defendants, and GSP's medical staff and correctional officers generally, are aware of this common practice and the resulting risk of infection.

25. When infected tattoos are treated early, significant illness and death is rare.

26. When an infection develops into sepsis and a patient goes into septic shock, the mortality rate is nearly 50 percent.[1]

---

[1] MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/sepsis/symptoms-causes/dxc-20169787 (last visited March 29, 2016).

27. About a week after receiving the tattoo, Mr. Davison's forearm became dark red, swollen, and inflamed. Medical personnel in a correctional setting know or should know that this kind of redness and inflammation on and around a recent tattoo signals an infection with a substantial risk of sepsis if improperly treated.

28. Upon information and belief, Mr. Davison did not receive medical treatment until he went into severe septic shock and multi-system organ failure, even though his symptoms clearly indicated that he required immediate treatment for infection.

**B.    Mr. Davison's attempts to obtain medical care**

29. On Friday, January 16, 2015, GSP transferred Mr. Davison from the A1 dormitory to the A4 dormitory.

30. At that time, Mr. Davison's forearm was beet red and swollen with pus due to an infection from the tattoo.

31. On January 17, Mr. Davison received a disciplinary report stemming from an altercation with another inmate.

32. Following the altercation, GSP officers took Mr. Davison to the medical unit where he received a visual, physical inspection in accordance with GSP standard operating procedure.

33. Any reasonable medical professional would know that redness and swelling at the site of a recently applied tattoo signals possible infection. Despite the apparent infection of his newly tattooed arm, GSP medical staff did not take any actions to treat the infection until long after any reasonable medical professional would have recognized the need for treatment.

34. As any medical professional would have anticipated, the infection continued to spread. By Monday, January 19, Mr. Davison felt pain in the shoulder of his tattooed arm. His shoulder and forearm were beet red.

35. Mr. Davison sought treatment from GSP's medical unit on January 21, showing additional symptoms of severe infection.

36. Rather than treat the apparent, life-threatening infection, the examining physician's assistant, Steve Nicolou, merely provided Mr. Davison with anti-inflammatory drugs, which cannot counteract an infection, and sent him back to his dormitory.

37. On January 21, Mr. Davison experienced pain in the shoulder opposite his tattooed forearm. In addition to his shoulder and forearm, his neck and chest at that time were beet red down to his mid-breast. Mr. Davison also was having trouble moving his newly tattooed arm. Mr. Davison therefore told the on-duty nurse about the increasingly critical symptoms listed above.

38. The on-duty nurse related Mr. Davison's descriptions of his symptoms to the on-duty physician's assistant, Steve Nicolou.

39. Steve Nicolou prescribed three drugs: Toradol (a non-steroidal, anti-inflammatory drug used for short term treatment of pain), Depo-Medrol (an anti-inflammatory glucocorticoid), and Solu-Medrol (same). None of these drugs are indicated for treatment of a bacterial infection. Defendant Nicolou did not prescribe any antibiotic treatment, even though any medical professional with Defendant Nicolou's training and experience would have known that antibiotics were clearly indicated in this case.

40. Between January 21 and January 23, Mr. Davison's medical condition continued to deteriorate, only now more dramatically. He required assistance from his roommate to get in and out of his bunk. Mr. Davison could not move his tattooed arm, and he had trouble walking and breathing. In fact, Mr. Davison was too weak to negotiate the one step that goes from the day room to the television room in his dormitory without assistance.

41. On the morning of Friday, January 23, Mr. Davison went to GSP's medical unit early in the morning. A medical staff member, under the supervision of and with the knowledge of Defendant Nicolou, refused to treat Mr. Davison once again. Instead, Mr. Davison was punished by being placed in a holding cell for approximately three hours before being returned to his dormitory.

42. On the evening of January 23, one of the correctional officers in Mr. Davison's dormitory talked to the on-duty nurse about Mr. Davison's red and swollen neck and the need to treat Mr. Davison's infection. According to a note in the dormitory logbook, the on-duty nurse told the officer that there was "nothing they can do" because there was no healthcare provider on duty at GSP on the weekend.

43. Despite Mr. Davison's life-threatening infection and obvious need for immediate medical care, Mr. Davison was denied the very medical care that would likely have saved his life because he became critically ill on a weekend. GCHC's protocols, policies, procedures, and practices did not require GCHC to provide medical care to GSP prisoners on weekends even in immediate, life threatening circumstances.

44. Although GCHC and its employees knew or should have known about Mr. Davison's life-threatening illness, no Defendant, on-call provider, or any other healthcare provider, came to diagnose or treat Mr. Davison during the weekend of January 24 and 25. Neither was Mr. Davison transported off-site for medical care, even though his condition clearly required immediate medical attention.

45. Mr. Davison's condition significantly worsened over that weekend. Too weak to stand, he urinated into bottles which a fellow prisoner emptied for

him. Other prisoners submitted multiple sick call requests on Mr. Davison's behalf.

46. Mr. Davison did not receive any further medical examination or treatment until Monday, January 26.

## C. Mr. Davison's death

47. On the morning of January 26, 2015, Mr. Davison was so ill that other prisoners had to help him out of bed. Mr. Davison was taken to the GSP medical unit by wheelchair.

48. At the medical unit, Mr. Davison presented with "purplish red" skin on his chest and neck, sharp and constant pain, and trouble breathing. His arm was reddened and scabbed.

49. By the time Mr. Davison finally received medical treatment on January 26, 2015, he was already in severe septic shock.

50. GSP transported Mr. Davison to Meadows Regional Medical Center in Vidalia, Georgia ("Meadows") on January 26, where he was placed in the intensive care unit (ICU).

51. When Mr. Davison arrived at Meadows he was in critical condition. At Meadows, Mr. Davison was diagnosed with staphylococcus, sepsis, acute renal failure, and rhabdomyolysis.

52. Upon his admission to Meadows, one of his treating physicians noted that "his life is very much at risk right now." Medical records show that he had gangrene on his limbs, in addition to renal failure, respiratory failure, and liver failure.

53. On February 7, Mr. Davison was transferred to Atlanta Medical Center's ICU.

54. Mr. Davison died in Atlanta Medical Center's ICU on February 15, 2015, as a result of Defendants' disregard and indifference to Mr. Davison's serious and life threatening medical need.

## VII. CLAIM FOR RELIEF

### VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

55. Plaintiff re-alleges, as if fully set forth herein, the allegations set forth in ¶¶ 1-54.

56. Mr. Davison had a serious medical need that posed a risk of serious harm and death.

57. Mr. Davison's serious medical need was so obvious that even a layperson could have recognized the need for immediate medical care to treat his infected arm and to prevent serious harm and death because: (a) Mr. Davison's infected arm was severely discolored, with the discoloration spreading from his

forearm to his neck, opposite shoulder, chest, and mid-breast; (b) the inflammation was visible even when Mr. Davison was fully clothed; (c) Mr. Davison lost the ability to move his tattooed arm; and (d) Mr. Davison was having difficulty breathing and walking without assistance.

58. Defendants were aware of Mr. Davison's serious medical need because: (a) he sought treatment for the infected arm on January 19, 21, and 23, 2015; (b) Mr. Davison's infection was visible even when Mr. Davison was fully clothed; (c) Mr. Davison repeatedly notified both correctional officers and medical staff of his need for medical care due to his infected arm; and (d) Defendants observed Mr. Davison's multiple symptoms of sepsis, including difficulties walking, breathing, and moving his infected arm.

59. Defendants showed deliberate indifference to Mr. Davison's serious medical need by ignoring his pleas for treatment multiple times over the course of a week and by isolating him in a holding cell on January 23, 2015, when he attempted to obtain medical treatment. Defendants further showed deliberate indifference to Mr. Davison's condition by failing to provide him potentially life-saving medical care, because they did not have health care providers readily available over the weekend.

60. Defendants were acting under color of state law when they failed to provide Mr. Davison necessary medical care. At all times relevant to this

12

Complaint, Defendant Nicolou was employed by or under contract with the Department or GCHC to fulfill the State's constitutional duty to provide medical care to its prisoners.

61. Defendants' policies, practices, acts, and omissions constituted deliberate indifference to a serious risk of harm to Mr. Davison and constituted clearly-established violations of the Eighth Amendment, made applicable to the states through the Fourteenth Amendment to the United States Constitution.

62. Defendants' deliberate indifference caused Mr. Davison's death. If not for Defendants' conduct, Mr. Davison would not have died. Mr. Davison's death was a reasonably foreseeable consequence of Defendants' failure to treat his life-threatening infection.

63. The Defendants' above-described actions were deliberate and in reckless disregard of the constitutional rights of Mr. Davison.

64. As a proximate result of Defendants' illegal and unconstitutional acts and omissions, Mr. Davison experienced grave physical, emotional, and psychological injury and pain leading up to his death.

65. Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial. Punitive damages are necessary to deter future Eighth Amendment violations by these Defendants and at this institution.

## VIII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

(a)   Assume jurisdiction over this action;

(b)   Grant Plaintiff a trial by jury;

(c)   Declare that the acts and omissions described herein violated Randall Davison's rights under the Constitution and laws of the United States;

(d)   Enter judgment in favor of Plaintiff and against each Defendant for all damages allowed by law, including, but not limited to:

    i.   The full value of the life of Randall Davison;

    ii.   Pain and suffering;

    iii.   Funeral and burial expenses;

    iv.   Nominal damages;

    v.   Punitive damages; and

    vi.   Award Plaintiff the costs of this lawsuit and reasonable attorneys' and expert fees and expenses pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise allowed by law;

(e)   Order such additional relief as this Court may deem just and proper.

*[Signatures on following page]*

Respectfully submitted this 4th day of April, 2016.

<div style="margin-left: 50%;">

s/ Gerald Weber
Gerald Weber
Ga. Bar No. 744878
Sarah Geraghty*
Georgia Bar No. 291393
SOUTHERN CENTER FOR
 HUMAN RIGHTS
83 Poplar Street, N.W.
Atlanta, Georgia 30303-1202
Telephone: (404) 688-1202
Facsimile: (404) 688-9440
*gweber@schr.org*
*sgeraghty@schr.org*

s/ Lawrence J. Bracken II
Lawrence J. Bracken II*
Georgia Bar No. 073750
Jason M. Beach*
Georgia Bar No. 043606
Daniel B. Millman*
Georgia Bar No. 603728
HUNTON & WILLIAMS LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Telephone: (404) 888-4000
Facsimile: (404) 888-4190
*lbracken@hunton.com*
*jbeach@hunton.com*
*dmillman@hunton.com*

**Attorneys for Plaintiff**

*Admission pro hac vice to be requested

</div>